**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

T.S., an individual,
Plaintiff,
v.
G6 HOSPITALITY, LLC;
G6 HOSPITALITY IP, LLC;
G6 HOSPITALITY PROPERTY, LLC;
G6 HOSPITALITY PURCHASING, LLC;
G6 HOSPITALITY FRANCHISING, LLC;
MOTEL 6 OPERATING, L.P.; and
ABOONA CORPORATION
d/b/a MOTEL 6 SOUTHGATE,
Defendants.

Civil Action No.: __________________
JURY TRIAL DEMANDED

**PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff T.S., by and through the undersigned counsel, and respectfully submits her Complaint for damages and makes the following averments.

**INTRODUCTION**

1. This is a civil action for damages brought pursuant to the Federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 18 U.S.C. § 1595.

2. Plaintiff meets the definition of a sex trafficking victim as she was induced by force, fraud, and coercion to engage in commercial sex acts at the Motel 6 located at 18777 Northline Road, Southgate, Michigan 48195 (the "Subject Hotel"), in 2018 through and inclusive of 2019.

3. Defendants G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. (collectively, the "G6 Defendants" or "Franchisor Defendants") are the franchisors of the

Motel 6 brand. Upon information and belief, they owned, operated or co-operated, controlled, and/or managed the Motel 6 brand and the franchising system through which the Subject Hotel operated throughout the period during which Plaintiff was trafficked.

4. Defendant Aboona Corporation (the "Franchisee Defendant") was the franchisee of the Subject Hotel throughout the period during which Plaintiff was trafficked, in 2018 through and inclusive of 2019. Upon information and belief, the Franchisee Defendant owned, operated, or co-operated, controlled, and/or managed the Motel 6 Southgate located in Southgate, Michigan through the G6 franchising system, and owned and/or operated the Subject Hotel throughout that period.

5. Section 1595 of the TVPRA provides for three distinct causes of action: (1) a claim against the trafficker who directly violated § 1591(a)(1), a criminal statute; (2) a beneficiary claim against the trafficker who directly violated § 1591(a)(2), a criminal statute; and (3) a beneficiary claim against a civil defendant benefiting from and receiving anything of value from participation in a venture which that person knew or should have known was engaged in sex trafficking. The subject lawsuit is applicable, in part, to prong three, i.e., a beneficiary claim against civil defendants.

## PARTIES

6. Due to the sensitive, private, and potentially retaliatory nature of the allegations herein, Plaintiff proceeds by her initials to protect the privacy and identity of this subject sex trafficked victim. Nationwide similarly situated Plaintiffs have proceeded by pseudonym or by their initials due to the foregoing.

7. Plaintiff T.S. is a resident of Michigan.

8. Defendant G6 Hospitality, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

9. Defendant G6 Hospitality IP, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

10. Defendant G6 Hospitality Property, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

11. Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

12. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

13. Defendant Motel 6 Operating, L.P. is a for-profit Delaware limited partnership with its principal place of business in Carrollton, Texas.

14. Defendant Aboona Corporation doing business as Motel 6 Southgate, is a Michigan domestic profit corporation, Michigan Department of Licensing and Regulatory Affairs identification number 800604293, initially incorporated on December 5, 2002. Its resident agent is Jamil Abo and its registered office is located at 3860 Vista Lane, West Bloomfield, Michigan 48323. Upon information and belief, said Defendant owned, operated, controlled, and/or managed the Subject Hotel located in Southgate, Michigan through the G6 franchising system during the entirety of the period in which Plaintiff was trafficked, in 2018 through and inclusive of 2019.

## JURISDICTION AND VENUE

15. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

16. This Court has personal jurisdiction over Franchisee Defendant. Franchisee Defendant purposefully availed itself of the privilege of conducting activities in Texas and in this District by soliciting and entering into a franchising relationship with the G6 Defendants in this District, by negotiating, executing, and performing the franchising agreements in this District, by directing payments, notices, reservations, reporting, and other required communications to the G6 Defendants in this District, and by agreeing to Texas law, to suit in this District, and to the waiver of objections to personal jurisdiction and venue here, all as further set forth in Paragraph 20 below and in particular Paragraph 20(a), (b), (c), (g), (n), and (q). Plaintiff's claims arise out of and relate to those contacts.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim — including the franchising venture between Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated, branded, and controlled — occurred, in substantial part, in Texas and in the Eastern District of Texas.

18. G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. have the same principal place of business, which is in Carrollton, Texas, within the Eastern District of Texas. Each of the G6 Defendants is therefore a resident of the Eastern District of Texas.

19. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(1). Each of the G6 Defendants maintains its principal place of business in the Eastern District of Texas and therefore resides in this District. Franchisee Defendant is subject to this Court's personal jurisdiction with respect to this action and therefore likewise resides in this District pursuant to 28 U.S.C. § 1391(c)(2). All Defendants are accordingly residents of the State of Texas.

20. The franchising venture pursuant to which Franchisee Defendant operated the subject motel occurred, in substantial part, in Texas because:

(a) upon information and belief, Franchisee Defendant actively sought out a franchising relationship by contacting the G6 Defendants in Texas;

(b) on information and belief, Franchisee Defendant acknowledged that the negotiation, execution, and acceptance of the franchising agreements occurred in the Eastern District of Texas;

(c) on information and belief, Franchisee Defendant agreed that its ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas;

(d) on information and belief, the franchising agreements had a choice of law provision selecting the law of Texas as the governing law;

(e) on information and belief, the franchising agreements required Franchisee Defendant to report information to the G6 Defendants in Texas, including information about all incidents involving safety, security, public relations, or serious injuries to

persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like T.S.;

(f) on information and belief, Franchisee Defendant agreed to submit all notices required under the franchising agreement to the G6 Defendants in the Eastern District of Texas;

(g) on information and belief, Franchisee Defendant was required to attend training and meetings in Texas;

(h) the G6 Defendants dictated policies related to safety, security, human trafficking, and hotel operations at the subject motel from their principal place of business in the Eastern District of Texas;

(i) on information and belief, Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the G6 Defendants from their principal place of business in the Eastern District of Texas;

(j) on information and belief, Franchisee Defendant was required to purchase insurance on behalf of one or more Texas entities (the G6 Defendants);

(k) upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by G6 from its principal place of business in Texas;

(l) upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by Franchisor in Texas;

(m) on information and belief, the benefit that Franchisee Defendant received from room rentals was governed by the Texas franchising agreement;

(n) on information and belief, Franchisee Defendant agreed to make all payments due under the franchising agreement at the G6 principal place of business in the Eastern District of Texas;

(o) the day-to-day operations of the subject motel were dictated, controlled, and influenced by many policies set and enforced by the G6 Defendants from their principal place of business in Carrollton, Texas;

(p) on information and belief, Franchisee Defendant signed a software licensing agreement with the G6 Defendants for the property management software the G6 Defendants required Franchisee Defendant to use when operating the subject motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms; and

(q) on information and belief, Franchisee Defendant agreed to file any lawsuit arising from the licensing agreement in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## FACTS

***I. T.S. was a Victim of Unlawful Sex Trafficking at the Subject Hotel Owned, Operated, Managed, and Controlled by Defendants.***

21. In 2018 through and inclusive of 2019, Plaintiff T.S. was trafficked at the Subject Hotel by her trafficker. Under the control of her trafficker, T.S. was induced by force, fraud, and coercion to engage in commercial sex acts at the Subject Hotel.

22. Plaintiff was trafficked by her trafficker, a male individual known to Plaintiff as "William," who operated a commercial sex trafficking enterprise at the Subject Hotel.

23. In addition to sex trafficking, the trafficker possessed, supplied, and distributed controlled substances, including crack cocaine and heroin, on the subject premises and inside the rooms used for the trafficking of T.S.

24. In order to induce T.S. by force, fraud, and coercion to engage in sex with sex buyers at the Subject Hotel:

(a) the trafficker supplied T.S. with crack cocaine and heroin, cultivated and sustained her dependence upon those controlled substances, and exploited that dependence as a means of coercion and control, including by withholding and threatening to withhold the substances upon which he had made her dependent;

(b) the trafficker physically abused, beat, and assaulted T.S., leaving visible signs of physical abuse on her body, including bruising and, on at least one occasion, a

swollen and split lip, which were readily observable by the staff of the Subject Hotel;

(c) the trafficker verbally abused, berated, and screamed at T.S., including openly and in the presence and hearing of the staff of the Subject Hotel;

(d) the trafficker exercised control over where T.S. was housed, when and for how long she remained at the Subject Hotel, and the rooms in which she was kept, and over the commercial sex dates she was required to perform;

(e) the trafficker instilled in T.S. the fear that she would suffer serious harm if his demands were not complied with.

25. T.S. was compelled to engage in commercial sex acts with many numerous sex buyers at the Subject Hotel.

26. Plaintiff was advertised by her trafficker, and by those acting at his direction, for commercial sex acts online, including on MegaPersonals and ListCrawler, upon information and belief using internet/Wi-Fi services available at the Subject Hotel.

27. The rooms used for the trafficking of T.S. at the Subject Hotel were rented on a short-term, recurring basis, on repeated occasions in 2018 through and inclusive of 2019.

28. The rooms used for the trafficking of T.S. at the Subject Hotel were rented by the trafficker or at the direction of the trafficker.

29. During the period she was trafficked at the Subject Hotel, T.S. repeatedly passed through the lobby and common areas of the Subject Hotel in the company of sex buyers, and did

so frequently, openly, and in the view of the staff of the Subject Hotel. T.S. was dressed in scant and revealing clothing when she did so.

30. T.S. was frequently seen crying by the staff of the Subject Hotel, in and about the hotel, during the period she was trafficked there.

31. On information and belief, housekeeping staff observed visible signs of physical abuse on her body, including bruising and, on at least one occasion, a swollen and split lip inflicted upon her by her trafficker.

32. On at least one occasion during the period she was trafficked at the Subject Hotel, a male employee of the Subject Hotel — whom T.S. understood to be a supervisor, and who at times worked at the front desk of the Subject Hotel — directed T.S. to keep the noise down, telling her that loud noises and screaming coming from the rooms used for her trafficking were audible to him. T.S. is able to describe this employee by his physical appearance and can identify him.

33. That same employee of the Subject Hotel had a friendly relationship with T.S.'s trafficker. T.S. observed the two of them speaking with one another frequently at the Subject Hotel.

34. The physical, behavioral, and psychological effects of sex trafficking on its victims are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the Subject Hotel including effects on T.S.'s appearance, dress, demeanor, movements throughout the hotel, her visible signs of physical abuse, her visible emotional distress, her evident use of and dependence upon controlled substances, and her interactions with her trafficker, hotel staff, sex buyers, and others. Observing these effects provided Defendants with notice that T.S. was being continually subjected to coercion, control, and exploitation.

***II. Sex Trafficking in the Hotel Industry Is a Well-Known and Pervasive Problem.***

35. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendant knew or should have known regarding the trafficking at the Subject Hotel, including the trafficking of T.S.

36. The signs of sex trafficking in a hotel environment follow well-established patterns and can be detected by appropriately trained staff.

37. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing the Subject Hotel, when enacting and enforcing policies and procedures applicable to the Subject Hotel and when training, educating, and supervising the staff of the Subject Hotel.

38. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to the signs of sex trafficking.

***III. Sex Trafficking Has Long Been Prevalent at G6 Branded Properties, and Defendants Have Known About It.***

39. Defendants have long been on notice of the pervasive problem of sex trafficking in the hotel industry. On information and belief, each of the Defendants has also long been on notice of sex trafficking occurring at Motel 6 properties including the Subject Hotel.

40. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los

Angeles. G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

41. The settlement required the G6 Defendants to change policies that were facilitating sex trafficking. Based on information and belief, G6 has failed to adequately implement and enforce such changes.

***IV. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel.***

42. G6 Defendants were specifically aware that sex trafficking was widespread, in general, and knew, or should have known that same was occurring at the Subject Hotel during and prior to the time that Plaintiff was trafficked there.

43. Upon information and belief, Defendants knew or should have known about the widespread trafficking at the Subject Hotel based on:

(a) the obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

(b) the fact that hotel staff observed the obvious signs of the trafficking of Plaintiff, including the visible signs of physical abuse on her body, her frequent and visible crying, her repeated passage through the lobby and common areas of the Subject Hotel in the company of a succession of sex buyers, in scant and revealing clothing, and her evident use of and dependence upon controlled substances;

(c) the fact that a supervisory employee of the Subject Hotel heard screaming and loud noises emanating from the rooms used for the trafficking of Plaintiff, and acknowledged as much directly to Plaintiff when he instructed her to keep the noise down;

(d) the friendly and ongoing relationship between a supervisory employee of the Subject Hotel and Plaintiff's trafficker, which Plaintiff repeatedly observed.

***V. Defendants knew T.S. was being trafficked at the Subject Hotel because of the obvious signs of her trafficking.***

44. During the period that T.S. was trafficked at the Subject Hotel, there were signs obvious to hotel staff and management that she was being trafficked, including:

(a) Steady foot traffic of sex buyers to and from the rooms rented for the trafficking of T.S.;

(b) T.S. repeatedly and frequently passed through the lobby and common areas of the Subject Hotel, in the direct view of hotel staff, accompanied by a succession of different men who were sex buyers, and did so while dressed in scant and revealing clothing;

(c) The rooms used for the trafficking were booked and paid for by the trafficker, or at the direction of the trafficker;

(d) T.S. was regularly seen by hotel staff in and about the Subject Hotel with visible signs of physical abuse on her body, including bruising and, on at least one occasion, a swollen and split lip;

(e) T.S. was frequently observed by hotel staff crying in and about the Subject Hotel;

(f) Loud noises and screaming emanated from the rooms used for the trafficking of T.S. and were audible to hotel staff, and a supervisory employee of the Subject Hotel acknowledged hearing them when he instructed T.S. to keep the noise down rather than intervening, reporting, or summoning assistance;

(g) The trafficker openly berated, verbally abused, and screamed at T.S. on the subject premises in the presence and hearing of hotel staff, in a manner that displayed his control and domination over her;

(h) A supervisory employee of the Subject Hotel, who at times worked the front desk, maintained a friendly and ongoing relationship with T.S.'s trafficker and was repeatedly observed by T.S. in conversation with him;

(i) T.S. exhibited open and obvious signs of the use of and dependence upon controlled substances, which were observable to hotel staff;

(j) Housekeeping staff entered and cleaned the rooms used for the trafficking, and observed or should have observed the tell-tale combination of items and conditions inside the rooms consistent with a high index of suspicion for sex trafficking, including an inordinate number of condoms, as well as drugs and drug

paraphernalia, together with suspicious individuals entering and exiting around the clock;

(k) The trafficker possessed, supplied, and distributed crack cocaine and heroin on the subject premises and inside the rooms used for the trafficking, in a manner observable to hotel staff;

(l) Plaintiff was advertised by her trafficker and those acting at his direction for commercial sex acts online, including on MegaPersonals and ListCrawler, upon information and belief using internet/Wi-Fi available at the Subject Hotel;

(m) Hotel staff observed the foregoing red flags, yet took no action to stop the trafficking, report it, or intervene.

45. Hotel staff and management observed, or should have observed, the foregoing obvious signs of sex trafficking including items set forth in the preceding paragraph.

46. When being trafficked at the Subject Hotel in 2018 through and inclusive of 2019, T.S. was aware that staff of the Subject Hotel observed T.S., her trafficker, as well as a frequent procession of sex buyers going in and out of the subject rented rooms and passing with her through the lobby and common areas of the hotel, contemporaneous with other signs and indicators of trafficking occurring on the subject premises.

47. T.S. knows that some of the individuals that witnessed and observed red flags indicative of sex trafficking were staff members in that the staff were readily identifiable to T.S. either by her knowing of the individual and/or by means of the staff wardrobe/nametag/hotel logo and/or by

means of a staff member being in an employee restricted area and/or by means of a staff member being stationed at the front desk of the Subject Hotel.

48. Based upon information and belief, multiple employees at the Subject Hotel, including management-level employees and front desk and housekeeping staff, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

49. As such, Defendants knew or should have known that T.S. was being trafficked at the Subject Hotel.

50. The foregoing red flags were not merely indicators of commercial sex activity but were indicators of sex trafficking specifically because they included observable signs of force, coercion, and control over T.S. — including the visible bruising and swollen and split lip on her body, the screaming and loud noises emanating from the rooms used for her trafficking that a supervisory employee acknowledged hearing, her frequent and visible crying, the trafficker's open verbal abuse and domination of T.S. in the presence of hotel staff, his exclusive control over the booking and payment of the rooms, his open supply and distribution of crack cocaine and heroin on the premises together with T.S.'s visible dependence upon those substances, and T.S.'s repeated escorting of a succession of sex buyers through the hotel's public areas rather than her own free and independent use of the premises as a guest. These signs, individually and collectively, provided Defendants with notice not only of sex trafficking activity generally at the Subject Hotel, but specifically that T.S. was being subjected to trafficking through force, fraud, and coercion.

***VI. Defendants actively facilitated sex trafficking at the Subject Hotel, including the trafficking of T.S.***

51. Defendants had both actual and constructive knowledge of the trafficking of T.S. at the Subject Hotel because the trafficking was, in part, a consequence of Defendants facilitating her trafficking at the Subject Hotel.

52. The rooms used for the trafficking of T.S. were rented and/or renewed by the trafficker, or at the direction of the trafficker on a repeated, recurring basis in 2018 through and inclusive of 2019.

53. Defendants rented rooms to individuals it knew or should have known were engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

54. Franchisee Defendant, through its staff, rented rooms used for the trafficking of T.S., collected payment for those rooms, and interacted face-to-face with T.S. and her trafficker on a regular and repeated basis. These were not passive observations of trafficking from a distance; Franchisee Defendant was involved in the commercial transactions that provided the venue for the trafficking of T.S.

55. Defendants knowingly benefited from the sex trafficking of Plaintiff at the subject hotel by receiving payment for the rooms rented that were used for sex trafficking, including as to the Plaintiff, in violation of the TVPRA in 2018 through and inclusive of 2019.

56. The rooms at the subject hotel that were used for the sex trafficking of the Plaintiff were booked by the trafficker under his own name and, on occasion, in Plaintiff's own name at his direction. Discovery will reveal additional facts concerning the manner in which the trafficker and

those acting at his direction booked rooms at the subject hotel that were used for the sex trafficking of the Plaintiff in violation of the TVPRA:

(a) whether cash, prepaid card, debit card or credit card was used at the time of respective booking or renewal; and

(b) whether staff of Defendants required for each booking that the renter show their identification.

57. Defendants allowed the trafficker and those acting at his direction on the subject premises to continue to pay for rooms rented at the subject hotel during the time that Plaintiff was being sex trafficked there in violation of the TVPRA.

58. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking in general and, on information and belief, at the Subject Hotel, Franchisee Defendant continued renting rooms used to sexually exploit Plaintiff.

59. Franchisee Defendant knew or should have known that T.S. was being trafficked and, despite this, benefited from continued association with her trafficker by providing a venue for her exploitation.

60. Franchisee Defendant also facilitated trafficking at the Subject Hotel, including the trafficking of T.S., in ways including:

(a) allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

(b) inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

(c) on information and belief, choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures, notwithstanding the obvious red flags of the trafficking of T.S. observable to its staff;

(d) responding to the screaming and loud noises emanating from the rooms used for the trafficking of T.S. — through a supervisory employee who acknowledged hearing them — by instructing T.S. to keep the noise down - thereby signaling to the trafficker that his conduct would be tolerated so long as it remained quiet;

(e) permitting a supervisory employee who at times worked its front desk to maintain a friendly and ongoing relationship with T.S.'s trafficker; and

(f) creating an environment where the trafficker did not need to incur the burden of taking significant steps to conceal his activities but, instead, could operate openly — including openly berating and dominating T.S. in the presence of staff, physically abusing her so as to leave marks visible to housekeeping staff, openly supplying and distributing controlled substances, and openly escorting a succession of sex buyers through the hotel's public areas — without concern for detection or interference by the hotel staff.

61. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of T.S.

62. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel, G6 continued renting rooms used to sexually exploit victims, including T.S.

63. G6 knew or should have known that T.S. was being trafficked and, despite this, benefited from continued association with her trafficker by providing hotel rooms and related services used for her exploitation.

64. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Hotel, the G6 Defendants continued participating in a venture at the Subject Hotel, with Franchisee Defendant and hotel staff, in a way that they knew or should have known would lead to additional sex trafficking, including but not limited to by the following:

(a) the G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

(b) the G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

(c) the G6 Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties;

(d) the G6 Defendants failed to ensure that franchisees and hotel staff reported or responded to criminal activity including sex trafficking appropriately;

(e) the G6 Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at G6 branded properties, including the Subject Hotel;

(f) the G6 Defendants attracted traffickers by maintaining a venue where access was easy, risks of interference were low, and traceability was minimal;

(g) the G6 Defendants allowed traffickers to reserve and pay for rooms on a short-term, day-by-day or night-by-night basis, which provided relative anonymity and non-traceability; and

(h) the G6 Defendants provided traffickers with access to internet services in a manner that the G6 Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

65. If G6 had exercised reasonable diligence when operating the Subject Hotel and in the areas where it retained control, G6 would have prevented the Subject Hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of T.S. Instead, G6 engaged in a course of conduct that facilitated widespread and ongoing sex trafficking, including the trafficking of T.S.

***VII. Defendants knowingly benefited from participation in a venture that they knew or should have known was engaged in sex trafficking.***

66. Through the conduct described above, Defendants knowingly benefited from engaging in a venture with the trafficker and with one another.

67. The repeated rental transactions between the trafficker (and those acting at his direction) and the Subject Hotel which occurred during the time that Plaintiff was trafficked at the subject hotel were colored by overt indicators of sex trafficking — including the steady foot traffic of sex buyers to and from the rooms, T.S.'s repeated escorting of sex buyers through the lobby and common areas in scant and revealing clothing, the visible bruising and swollen and split lip, her frequent and visible crying, the screaming and loud noises emanating from the rooms that a supervisory employee acknowledged hearing, the friendly and ongoing relationship between that supervisory employee and the trafficker, the trafficker's open verbal domination of T.S. in the presence of staff, an inordinate number of condoms observable to housekeeping, and the open supply and distribution of crack cocaine and heroin on the premises — such that said Defendant knew, or should have known, that Defendant was renting rooms to, and facilitating, individuals engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

68. A venture existed between the trafficker and Franchisee Defendant at the subject hotel premises by means of rooms repeatedly rented for the trafficking, which rooms Defendants knew, or should have known, were being used for the sex trafficking of Plaintiff in violation of the TVPRA, and which the parties wished to continue for profit.

69. A venture also existed between Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated, branded, and controlled.

70. Relative to the subject hotel, a continuous business relationship existed between Franchisee Defendant and the trafficker's sex trafficking business, in part, in that Defendant provided assistance, support, or facilitation to the trafficker and individuals it knew or should have known were involved in sex trafficking on the premises, in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the trafficking venture's success.

71. Relative to the subject hotel, a continuous business relationship existed between Franchisor Defendants and the trafficker's sex trafficking business, in part, in that said Defendants provided assistance, support, or facilitation to the trafficker and individuals they knew or should have known were involved in sex trafficking on the premises in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the trafficking venture's success.

72. Through the conduct described above, each Defendant also knowingly benefited from engaging in a commercial venture with other Defendants operating the Subject Hotel. Defendants associated with one another and with the hotel staff to operate the Subject Hotel. Each Defendant received financial benefits from operating the Subject Hotel, including revenue generated specifically by renting rooms used for the trafficking. They engaged in revenue sharing and had a common incentive to maximize revenue.

***VIII. Franchisee Defendant and the Staff at the Subject Hotel Acted as Actual Agents of G6.***

73. G6 is vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant and the staff of the Subject Hotel.

74. The G6 Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Hotel through the franchising agreements,

through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the G6 Defendants.

75. The G6 Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the G6 Defendants imposed on the Franchisee Defendant:

(a) did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Hotel;

(b) covered virtually all aspects of hotel operations, including internal operating functions;

(c) dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Hotel; and

(d) significantly exceeded what was necessary for G6 to protect its registered trademarks.

76. In addition to the foregoing, upon information and belief, G6 exercised and reserved the right to exercise control over the day-to-day operation of the Subject Hotel, including:

(a) requiring franchisees and management to participate in mandatory training programs covering all aspects of hotel operations;

(b) controlling training content and methods for hotel staff;

(c) designating approved vendors and prohibiting purchases from non-approved sources;

(d) requiring use of specific technology, hardware, software, and property management systems;

(e) setting required staffing levels;

(f) establishing detailed job descriptions and dictating which positions must perform which tasks;

(g) setting requirements for hiring, overseeing discipline, and termination decisions;

(h) controlling channels for guest complaints and directly participating in responses;

(i) generating reports and analysis of guest complaints and online reviews;

(j) requiring use of a Guest Relations Application owned and operated by G6;

(k) regularly auditing books and records;

(l) conducting frequent and unscheduled inspections;

(m) retaining the right to issue fines, require corrective action plans, and terminate franchising agreements;

(n) controlling all marketing and prohibiting unauthorized online presence; and

(o) imposing detailed recordkeeping and reporting requirements regarding virtually all aspects of hotel operations.

77. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred, including:

(a) publicly assuming responsibility and control over the human trafficking response of all Motel 6 and Studio 6 properties;

(b) retaining control over when branded hotels would share information with law enforcement;

(c) creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking and determining when issues should be escalated;

(d) retaining control over determining which hotels needed additional training based on high risk of trafficking;

(e) retaining control to terminate staff or franchising agreements based on the response to human trafficking;

(f) retaining control over all training on how to spot and prevent human trafficking;

(g) maintaining a Safety & Security Team and Critical Incident Rapid Response Team for investigating potential criminal incidents;

(h) adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking; and

(i) maintaining control over internet services at the Subject Hotel, including whether sites used to solicit sex trafficking victims would be accessible.

78. G6 directly participated in and retained day-to-day control over renting rooms at the Subject Hotel by, among other things:

(a) controlling all details of the guest reservation, check-in, and payment processes;

(b) directly making reservations and accepting payment through a central reservation system without requiring franchisee approval;

(c) establishing and maintaining a brand-wide guest rewards and loyalty program;

(d) controlling room rates, required discounts, mandatory fees, and rewards programs;

(e) controlling and restricting the ability of franchisees and staff to refuse or cancel a reservation;

(f) controlling policies and procedures regarding check-in, payment and identity verification;

(g) collecting, retaining, monitoring, and analyzing detailed data about every guest; and

(h) exercising and retaining the right to exercise control over virtually all aspects of room reservations and payment.

***IX. G6 Defendants are jointly responsible for the trafficking of T.S.***

79. All the G6 Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

80. Upon information and belief, operation of the Subject Hotel was part of a single unified operation by G6 Defendants. Upon information and belief, all G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos.

***X. Causation.***

81. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to T.S.

82. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to T.S. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

**CAUSES OF ACTION — SEX TRAFFICKING UNDER THE TVPRA**

83. T.S. incorporates all other allegations.

***COUNT I. Cause of Action: Beneficiary Liability under § 1595(a) of the TVPRA (all Defendants)***

84. T.S. is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is entitled to bring a civil action against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

85. Through acts and omissions, and participation, described throughout this Complaint, Defendants received a financial benefit from participating in a venture with traffickers, including

T.S.'s trafficker, even though Defendants knew or should have known that this trafficker was engaged in violations of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2). Thus, Defendants are liable as a beneficiary under 18 U.S.C. § 1595(a).

86. Through the acts and omissions described throughout this Complaint, G6 Defendants received a financial benefit from participating in a venture with Franchisee Defendant regarding the operations of the Subject Hotel even though G6 Defendants knew or should have known that this venture was violating 18 U.S.C. §§ 1591(a) and 1595(a).

87. Defendants' participation in these ventures combined with the trafficker's conduct, and the other unlawful acts and omissions alleged in this Complaint, to cause T.S. to suffer substantial physical and psychological injuries and other damages because of being trafficked at the Subject Hotel.

***COUNT II. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants)***

88. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

89. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

90. Franchisee Defendant acted as the actual agent of G6 Defendants when operating the Subject Hotel.

91. Through the acts and omissions described throughout this Complaint, G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendant to operate the Subject Hotel.

92. G6 Defendants are vicariously liable for the TVPRA violations of Franchisee Defendant and the subagents of that franchisee.

**DAMAGES**

93. As a direct and proximate result of Defendants' conduct, T.S. has suffered and will continue to suffer substantial damages.

94. Defendants' involvement and failure to timely and properly prevent the sex trafficking or timely intervene regarding same was a proximate cause of the injuries and damages sustained by T.S. in this case including, but not limited to, being the victim of sex trafficking when at the Subject Hotel and suffering personal injury and the trauma physically and mentally of being induced to engage in commercial sex with numerous sex buyers while being trafficked, and while simultaneously being under fear of harm if she did not comply, being subjected to repeated physical abuse and violence — including beatings leaving visible bruising and a swollen and split lip — being subjected to sustained verbal abuse and degradation, being supplied with crack cocaine and heroin and kept dependent upon those controlled substances by her trafficker as a means of coercion and control, and being deprived of the freedom to leave, as well as all residual injuries suffered by PTSD.

95. T.S. being sex trafficked at the Subject Hotel was a proximate cause, competent cause, and substantial factor in causing her severe and permanent injuries including but not limited to

personal injuries including the horror of being a victim of sex trafficking as well as significant levels of psychological trauma due to the levels of abuse she was caused to endure during the time she was trafficked. This trauma led to depression, anxiety disorders, substance use disorder, and PTSD, which in turn affects daily functioning.

96. As a consequence of being sex trafficked at the Subject Hotel, T.S. suffered and will continue to suffer substantial economic, physical, mental, emotional, psychiatric, and psychological injuries as the result of being trafficked and sexually exploited at the Subject Hotel in violation of 18 U.S.C. § 1591.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as identified in the above-referenced Counts and as follows:

(a) All available compensatory damages for the described losses with respect to the above cause of action;

(b) Past and future emotional distress;

(c) Consequential and/or special damages;

(d) All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

(e) Physical pain and suffering;

(f) Disgorgement of profits obtained through unjust enrichment;

(g) Restitution;

(h) All damages allowable under the TVPRA;

(i) Attorneys' fees as allowed by law;

(j) Punitive damages with respect to each cause of action;

(k) Costs of this action;

(l) Prejudgment and all other interest recoverable; and

(m) Such other and further relief to which T.S. may, in law or in equity, show herself to be justly entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: July 24, 2026

Respectfully submitted,

/s/ Jason Byrd
Jason Byrd
448 Orleans
Beaumont, TX 77701
Telephone: (409) 924-0660
Facsimile: (409) 924-0035
jason@txbyrd.com

Randolph D. Janis, Esq.
DOUGLAS & LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
rjanis@douglasandlondon.com

Chloe Makowsky, Esq.
DOUGLAS & LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
cmakowsky@douglasandlondon.com

Attorneys for Plaintiff